**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THE BARNES FIRM L.C., individually and on behalf of all those similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> HEARST COMMUNICATIONS, INC.; GRAY TELEVISION, INC.; NEXSTAR MEDIA GROUP, INC.; TEGNA INC.; TRIBUNE MEDIA COMPANY; and SINCLAIR BROADCAST GROUP, INC., <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> <u>JURY TRIAL DEMANDED</u> |

**<u>COMPLAINT</u>**

Plaintiff The Barnes Firm, L.C. ("Plaintiff"), individually and on behalf of a class of all those similarly situated, brings this action under the antitrust laws of the United States against Defendants, and demands a trial by jury. Plaintiff makes these allegations on personal knowledge of its own actions and on information and belief as to other matters.:

## NATURE OF ACTION

1.      This is an antitrust class action brought to recover for the injuries sustained by Plaintiff and the members of the class caused by Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff alleges a conspiracy among Defendants and their co-conspirators which proximately and foreseeably caused Plaintiff and the Plaintiff Class to suffer injuries by stifling competition and inflating, fixing, raising, stabilizing, or maintaining prices for television advertising in the United States. This action is brought on behalf of a Plaintiff Class, defined more fully Paragraph 22 below, consisting of all persons and entities in the U.S. who paid for local television advertising directly to Defendants, or any current or former subsidiary or affiliate of Defendants, or any co-conspirator, from at least and including January 1, 2014. Plaintiff seeks treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and Rule 23 of the Federal Rules of Civil Procedure.

2.      Defendants are horizontal competitors for the sale of television advertising in multiple geographic areas, known in the industry as Designated Market Areas ("DMAs"). They are among the largest and most powerful media companies in the country and operate and own local television stations throughout the U.S. and include Hearst Communications, Inc. ("Hearst"), Gray Television, Inc. ("Gray"), Nexstar Media Group, Inc. ("Nexstar"), Tegna Inc. ("Tegna"), Tribune Media Company ("Tribune"), and Sinclair Broadcast Group, Inc. ("Sinclair"),

(collectively, "Defendants").

3.     Defendants have experienced significant slowing in revenue growth in recent years, due in part to increased competition for advertising dollars from alternative media companies like Google and Facebook.  This decline is evidenced by consolidation in the ownership of "independent" local television stations.  Rather than competing more vigorously, Defendants and their co-conspirators responded by colluding to artificially inflate pricing above competitive levels.

4.     To effectuate their scheme, members of the Defendants' advertising sales teams unlawfully shared competitively sensitive information and data with each other to reduce competition and raise advertising prices to levels higher than they otherwise would have been absent collusion.  Defendants and their co-conspirators had numerous opportunities to do so, through industry associations such as the Television Bureau of Advertising, Inc. ("TVB") and the National Association of Broadcasters ("NAB"), conferences and meetings held by those associations, and through merger negotiations.

5.     On July 26, 2018, *The Wall Street Journal* and others reported that Sinclair, Tribune, Hearst, Nexstar, and Tegna are the subjects of an ongoing U.S. Department of Justice ("DOJ") investigation into whether communication between the stations' advertising sales teams led to higher rates for TV commercials.

6.     The impact of Defendants' unlawful and anticompetitive conduct is ongoing and requires injunctive relief to prevent future harm to Plaintiff and the Plaintiff Class.

7.     Until the publication of reports regarding the DOJ investigation on July 26, 2018, Defendants fraudulently concealed their unlawful conduct, and Plaintiff and the members of the Plaintiff Class had no way of knowing of Defendants' unlawful collusion.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

9.     This Court has personal jurisdiction over each of the Defendants due to their business activities in this District.

10.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 28 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in this District, a substantial part of the events giving rise to Plaintiff's claims occurred in or affected this District, and a substantial portion of the affected interstate trade and commerce described has been carried out in this District.

## PARTIES

Plaintiff

11.    Plaintiff The Barnes Firm L.C. is a California professional corporation located at 633 W. 5th St., Suite 1180, Los Angeles, CA 90071.  The Barnes Firm L.C. operated under the name Cellino & Barnes L.C. until July 24, 2017, when its name was changed to The Barnes Firm L.C.  (The Barnes Firm L.C. and Cellino and Barnes L.C. have at all times operated and purchased advertisements separately from Cellino & Barnes P.C, a New York professional corporation.)  During the Class Period, Plaintiff purchased television advertisement time directly from Defendants in the Los Angeles, San Francisco-Oakland and San Diego DMAs and elsewhere and has been injured in its business or property because of the antitrust violations alleged herein.

Defendants

12.      "Defendant" or "Defendants", includes, in addition to those named specifically

4

below, the named Defendants' predecessors, including merged or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that received payment for television advertising in interstate commerce directly from purchasers in the United States during the Class Period.

13. Defendant Hearst is a diversified media and information company headquartered at 300 West 57th Street, New York, New York 10019. Hearst operates television stations and cable networks throughout the U.S. Hearst has ownership interests in 31 television stations which reach a combined 19% of U.S. viewers.

14. Defendant Gray is a television broadcast company headquartered at 4370 Peachtree Road, NE, Suite 400, Atlanta, Georgia 30319. Gray owns and operates television stations and digital assets in the U.S. As of February 23, 2018, Gray owned and operated television stations in 57 television markets, broadcasting approximately 200 program streams, including approximately 100 channels affiliated with the CBS Network, the NBC Network, the ABC Network, and the FOX Network. On June 23, 2018, Gray entered into a merger agreement with Raycom Media, Inc. If the merger is approved and closed Gray expects to own and/or operate 142 full-power television stations serving 92 markets reaching approximately 24 percent of U.S. television households (before divestitures due to market overlaps).

15. Defendant Nexstar is a television broadcasting and digital media company headquartered at 545 East John Carpenter Freeway, Suite 700, Irving, Texas 75062. As of December 31, 2017, the company owned, operated, programmed, or provided sales and other services to 170 television stations in 100 U.S. markets.

16. Defendant Tegna is a broadcasting, digital media, and marketing services company and is headquartered at 7950 Jones Branch Drive, McLean, Virginia 22107. Tegna

owns and operates 47 television stations in 39 markets across the U.S.

17.     Defendant Tribune is a media and entertainment company headquartered at 515 North State Street, Chicago, Illinois 60654 and through its subsidiaries, in the U.S. offers news, entertainment, and sports programming through Tribune Broadcasting's local television stations, including affiliates of FOX, CW Network, CBS, ABC, MY, NBC, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network.  Tribune owns 43 broadcast television stations in approximately 35 U.S. cities.

18.     Defendant Sinclair is a television broadcast company headquartered at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030 in the U.S.  As of December 31, 2017, it owned, operated, and/or provided services to 191 stations in 89 U.S. markets, which broadcast 601 channels.

## CO-CONSPIRATORS

19.     Various other persons, firms, and corporations, not named as Defendants, may have participated as co-conspirators with Defendants and performed acts and made statements to further the conspiracy.

20.     Whenever reference is made to any act of any corporation or entity, the allegation means that the corporation or entity engaged in the act by or through its officers, directors, agents, employees, managers, members, managing partners or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

21.     Each of the Defendants acted as the agent or joint venturer of, or for, other Defendants as to the acts, violations, and common course of conduct alleged.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action on behalf of itself and as a class action under Rule

23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the

class described as follows (the "Class"):

> All persons and entities in the U.S. who paid for advertisement time directly to Defendants, or any current or former subsidiary or affiliate of Defendants, or any co-conspirator, from at least as early as January 1, 2014 until the Present.

> Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.

> Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

23.     Class Identity: The Class is readily identifiable and is one for which records

should exist.

24.     Numerosity: Due to the nature and amount of the trade and commerce involved,

Plaintiff believes there are thousands of Class members, the exact number and their identities

being known to Defendants or capable of identification via third parties.

25.     Typicality: Plaintiff's claims are typical of the claims of the members of the Class

because Plaintiff paid for advertisement time directly from one or more of the Defendants,

including their current or former subsidiaries or affiliates, or their co-conspirators, and therefore

Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the

members of the Class and the relief sought is common to the Class.

26.     Common Questions Predominate: There are questions of law and fact common

to the Class, and which predominate over questions affecting only individual members of the

Class, including, but not limited to:

    a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict fix, raise, maintain or stabilize the prices of local television advertising time;

    b.    The identity of the participants in the conspiracy;

    c.    The duration of the conspiracy and the acts performed by Defendants and their co-conspirators to further the conspiracy;

    d.    Whether the conspiracy violated Section 1 of the Sherman Act;

    e.    Whether the conduct of Defendants and their co-conspirators, injured the business or property of Plaintiff and the Class;

    f.    The effect of the alleged conspiracy on the cost of local television advertising time during the Class Period;

    g.    Whether the Defendants and their co-conspirators fraudulently concealed the existence of the conspiracy;

    h.    The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

    i.    The appropriate class-wide measure of damages.

27.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class and arise out of the same common course of conduct. And, Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

28.    <u>Superiority</u>: A class action is superior to other methods for the fair and efficient

adjudication of this controversy since individual joinder of all Class members is impractical. Prosecution as a class action will eliminate repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted. Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

## <u>TRADE AND COMMERCE</u>

29.     Billions of dollars of transactions in local television advertisements are entered into each year in interstate commerce in the U.S. and the payments for those transactions flow in interstate commerce.

30.     The local television landscape in the U.S. consists of parent companies who own dozens of local TV stations that carry programming distributed through their broadcast platform.

31.     In 2016, the six largest companies with the most television household reach in local TV were Defendants Sinclair, Tribune, Nexstar, Tegna, Gray, and Hearst. As reported by the Pew Research Center, these companies owned, operated or serviced over 443 full-powered stations, a more than 147.5% increase from the number of local TV stations owned operated and serviced in 2004.

32.     A DMA is a geographic area for which A.C. Nielsen Company furnishes broadcast television stations and others with data to aid in evaluating audience size and composition. Defendants sell television advertising to local advertisers in multiple DMAs

9

throughout the U.S.

33.     There are over 200 DMAs in the U.S.  According to Nielson, Los Angeles is the second largest DMA with 5.4 million TV homes, San Francisco-Oakland is the sixth largest DMA with just over 2.4 million TV homes, and San Diego is the 28th largest DMA with over 1 million TV homes.



34.     During both national and local programing, a portion of commercial advertising is designated for local advertisements.  Local advertisements are typically for regional or local businesses and are only broadcast to the local station's viewership whereas advertisements for global brands are broadcast across all of a network's affiliate stations.

35.     As summarized by the Federal Communications Commission:

A distinction exists between the national and the local television advertising markets, based on the location of the consumers that the purchaser of the advertising time intends to reach. Some companies (local advertisers) serve a geographically limited, or local, market and therefore wish to purchase advertising that reaches only local consumers. In contrast, other companies (national advertisers) compete in much larger geographic markets, and consequently seek to reach consumers nationwide.[1]

36.     Advertising rates are typically based on Gross Rating Points ("GRP"). GRP is calculated based on the percentage of the market an advertisement is predicted to reach multiplied by the number of times the advertisement runs per week. For example, an advertisement thought to reach 40% of a market or platform and run five days a week would have GRP of 200. For GRP calculation, an advertisement's reach is based on what the Nielsen ratings were during the same time the prior year. Therefore, GRP rates, even for the same program, can vary by local market and demographic makeup.

37.     GRP is the total points that a buyer will purchase. GRP is broken down to individual rating points. These rating points are assigned a dollar value by the Defendants that in a competitive market would be based on the time of day or type of programing.

38.     The cost to buy a GRP rating point is the Cost Per Point ("CPP") which varies by time of day and nature of programing. Prime time and sports typically have the highest CPP. Daytime usually has the lowest CPP. Unlike Nielson ratings, CPPs are proprietary to each seller of advertising.

39.     Defendants provide "rate cards" to prospective local advertising customers. Rate

---

[1] FCC, Notice of Proposed Rule Making, Review of the Commission's Regulations Governing Broadcast Television Advertising (1995), https://transition.fcc.gov/Bureaus/Mass_Media/Notices/fcc95226.html (last accessed Sept. 20, 2018).

cards are based on GRP for various programing.  Negotiations are based on the rate cards provided by the seller.  Many customers shop around and solicit rates hoping to find lower prices.  Because rates vary by the popularity of the programing, overall prices for a time of day in a DMA will not be uniform across various stations.  Further, because the historic Nielsen ratings used to calculate GRP are publicly known and the number of times an advertisement will run per week varies from project to project, the truly proprietary information in any station's or sales entity's pricing model is the CPP.  If Defendants collusively shared this information, they could fix the price for local TV advertisements across markets.

40.     In recent years, television broadcasting companies' growth in advertising revenues have slowed significantly due to increased competition from internet and media.  This chart depicts the slowing growth of television advertising spending in the U.S. since 2012:



41.     Likewise, viewership has steadily migrated from broadcast television to digital and online platforms:



**VIOLATIONS ALLEGED**

42.     Defendants and their co-conspirators understood that they could halt the downward pressure on the prices of local television commercials by conspiring to fix rates and/or not compete on rates across the numerous markets in which they operate.  In response to falling advertisement sales, Defendants colluded on pricing, forcing Plaintiff and members of the Class to pay supracompetitive prices for local television advertising.  The structure and market dynamics of the local television advertising market facilitated Defendants' scheme.

43.     Department of Justice Investigation: On May 8, 2017, Defendant Sinclair announced an agreement to acquire Defendant Tribune for $3.9 billion.  On July 26, 2018, *The Wall Street Journal* reported that the DOJ is investigating whether Defendants Sinclair, Tribune, and others unlawfully shared information and coordinated efforts to artificially raise prices for television commercials[2] and Newsmax.com reported that Defendants Hearst, Nexstar, and Tegna

---

[2] *Justice Department Investigates TV Station Owners Over Advertising Sales*, Wall Street Journal, Jul 26, 2018, available at https://www.wsj.com/articles/justice-department-investigates-

are also subjects in the DOJ probe.[3]  Numerous news reports indicate that the DOJ's Antitrust Division uncovered information that led it to investigate Defendants' conspiracy to artificially inflate television advertising prices during the Sinclair-Tribune merger review process.[4] Specifically, the DOJ is reportedly investigating whether Defendants "coordinated efforts when their ad sales teams communicated with each other about their performance" such as CPP and GRP, *i.e.*, a price grid, to artificially inflate television advertising prices in violation of federal antitrust laws.

44.    On August 9, 2018, Tribune announced its withdrawal from the $3.9 billion merger with Sinclair**.**

45.    The market structure and dynamics for local television advertising make it conducive to anticompetitive conduct among Defendants and make collusion particularly feasible and attractive.  The local television advertising market (1) is becoming increasingly concentrated; (2) has high barriers to entry; and (3) participants have motives and ample opportunities to conspire.

46.    <u>Market Concentration</u>: A highly-concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.  In response to decreased advertisement spending, the local television industry market has been consolidating and

tv-station-owners-over-advertising-sales-1532633979 (last accessed Sept. 19, 2018) ("Wall Street Journal article").

[3] *DOJ Probes Sinclair, Other TV Stations for Ad Rate Collusion*, Newsmax,com, Jul. 26, 2018, available at https://www.newsmax.com/t/newsmax/article/874049 (last accessed Sept. 19, 2018) ("Newsmax article").

[4] *See, e.g.*, Wall Street Journal article, Newsmax article; *see also DOJ Investigating if Sinclair, Tribune collude on TV Sales*, LA Biz, Jul. 26, 2018, available at https://www.bizjournals.com/losangeles/news/2018/07/26/doj-investigating-if-sinclair-tribune-colluded.html (last accessed Sept. 19, 2018).

is continuing to consolidate. For example:

      a.    On June 25, 2018, Defendant Gray TV agreed to buy fellow television-station owner Raycom Media Inc. in a $3.65 billion deal that would create a company that reaches nearly a quarter of U.S. TV households. The combined company would own 142 television stations in 92 U.S. markets, reaching 24% of TV households and owning the third-largest number of stations.

      b.    This chart depicts recent industry consolidation including the prospective effects of the failed Sinclair-Tribune merger:



47. <u>Barriers to Entry</u>: Barriers to market entry facilitate the formation and maintenance of cartels and market-allocation agreements. The incumbent broadcasters have long-established relationships with viewers, advertisers, programmers, networks or syndicators. A potential new entrant to the market would need to invest significant capital and time, and acquire technical ability and viewers to achieve the scale compete in local television advertising. For example, Defendant Sinclair "believe[s] the greatest opportunity for a sustainable and growing

customer base lies within [its] local communities" which it has developed by training "a strong local sales force at each of [its] television stations, which is comprised of approximately 800 marketing consultants and 100 local sales managers company-wide."

48.    The value of recent mergers in the industry demonstrates that entry barriers are high: the Gray-Raycom merger is priced at $3.6 billion and the Sinclair-Tribune merger was priced at $3.9 billion.

49.    <u>Motive and Opportunity</u>:  In 2017, U.S. television advertising sales fell 7.8 percent to $61.8 billion, the steepest decline experienced by the industry in at least 20 years.  According to data from MagnaGlobal, a resource that develops investment strategies for industry heads, there is no sign of an increase in 2018:



**Drop in National TV Ads Forecast**
The ad-buying firm Magna said that national TV ad sales fell 2.2 percent in 2017. It predicted that they would decline at least 2 percent each year through 2022.

The forecast excludes local TV and ads from cyclical events like the Olympics and U.S. presidential campaigns.

By The New York Times | Source: Magna

50.    "In a healthy economy, we're looking at no growth in advertising from traditional media companies," said Michael Nathanson, an analyst with research firm, MoffettNathanson.

"That's a worrying trend."[5]  This accelerating decline in television viewership is due in part to the rise in online video market, which is capturing almost every new advertising dollar entering the marketplace.[6]  Almost half of the growth in local video advertising spending during the next five years will go to digital platforms, including local mobile video, local online video and out-of-home video, according to a new study on advanced television advertising published by BIA/Kelsey industry analysts.[7]  "Television ad sales have fallen even as global advertising grows, leading research firms and analysts to predict that the business may never recover."[8]

51.     According to Defendant Sinclair's 2017 annual report, a primary source of revenue for local television stations is "the sale of commercial inventory on . . . television stations to . . . advertising customers."  However, Sinclair also concedes that "advertising revenue can vary substantially from period to period based on many factors beyond [its] control."  Further, "[t]his volatility affects [its] operating results and may reduce [its] ability to repay indebtedness or reduce the market value of [its] securities."  Sinclair admits that its "operating results depend on the amount of advertising revenue [it] generate[s]."

52.     Because Defendants largely rely on revenue from local television advertising to sustain their daily operations declining sales Defendants motivated them to conspire to artificially

---

[5] *TV Ad Sales Drop 7.8% in 2017; Analyst: It's a Worrying Trend,* Response Magazine, Feb. 21, 2018, available at https://www.responsemagazine.com/media/tv-ad-sales-drop-7-8-2017-analyst-it-s-a-worrying-trend (last accessed Sept. 19, 2018).

[6] *Improvements in Advanced TV Will Facilitate Reaching Local Audiences and Propel the Local Advertising Marketplace in 2018 and Beyond*, BIA Advisory Services, Feb. 6, 2018, available at http://www.biakelsey.com/improvements-advanced-tv-will-facilitate-reaching-local-audiences-propel-local-video-advertising-marketplace-2018-beyond/ (last accessed Sept. 19, 2018).

[7] *Id.*

[8] *Advertisers tuning out TV in sign of trouble for media companies*, LiveMint, Feb. 14, 2018, available at https://www.livemint.com/Consumer/atbho3zANqYCI6mSIXhMAM/Advertisers-tuning-out-TV-in-sign-of-trouble-for-media-compa.html (last accessed Sept. 19, 2018).

raise the prices of local TV advertisements.

53. Defendants also had numerous opportunities to meet and conspire and to perform acts necessary for the operation and furtherance of the conspiracy including under the guise of legitimate business contacts.

54. Mergers and merger negotiations provided Defendants with opportunities to meet and conspire. Almost 300 full-power local TV stations changed hands in 2013.[9] Many deals resulted in stations in the same market separately owned but operated jointly, a practice that has grown exponentially in recent years. As of 2014, joint service agreements existed between Defendants and other local TV station owners in at least 94 markets, almost half of the 210 local television markets nationwide, and up from 55 in 2011.[10] Specifically, Defendant Sinclair reports that "[c]ertain of [its] stations have entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services[,] . . . sales services[,] and other non-programming operating services."[11]

55. Defendants and their co-conspirators also had numerous opportunities to conspire through industry associations such as the Television Bureau of Advertising, Inc. ("TVB"), the National Association of Broadcasters ("NAB"), and other trade groups.

    a. Defendants Hearst, Nexstar, Sinclair, Tegna, Gray, and Tribune are

---

[9] *The acquisition binge in local TV*, Pew Research Center, May 12, 2014, available at http://www.pewresearch.org/fact-tank/2014/05/12/the-acquisition-binge-in-local-tv/ (last accessed Sept. 19, 2018).

[10] *The FCC's Rules and Policies Regarding Media Ownership, Attribution, and Ownership Diversity,* Congressional Research Service, Mar. 12, 2015, at 5, available at https://www.everycrsreport.com/files/20150312_R43936_483ea136b52c13b60386ee728493d657841f42af.pdf (last accessed Sept. 19, 2018).

[11] Form 10-k, Sinclair Broadcast Group, fiscal year ended Dec. 31, 2016, at 16, available at https://www.sec.gov/Archives/edgar/data/912752/000091275217000006/sbgi-20161231x10k.htm (last accessed Sept. 19, 2018).

members of Television Bureau of Advertising, Inc. ("TVB"). Nexstar's President and CEO serves as the Chairman of TVB. The TVB is a "not-for-profit trade association representing America's $21 billion local broadcast television industry" whose "members include over 800 individual television stations, television broadcast groups, advertising sales reps, syndicators, international broadcasters, and associate members."[12] TVB brings together and encourages information sharing among employees of broadcast television companies, including Defendants, especially advertising sales representatives. TVB members have access to the advertising spending and revenue data of members via the TVB AE Dashboard, and TVB Road Shows, described as "a customized market event for local advertisers not currently using broadcast TV . . . hosted by TVB member stations."[13]

b.  On November 20, 2017, a group of broadcast television companies, including Defendants Hearst, Nexstar, Sinclair, Tegna, and Tribune, announced the launch of the TV Interface Practices or "TIP" Initiative, described as "an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local

---

[12] *See, e.g., TIP Initiative Reports Progress in Accelerating Electronic Transaction Workflows for Local Television Advertising*, About TVB, BusinessWire, Apr. 9, 2018, available at https://www.businesswire.com/news/home/20180409005979/en/TIP-Initiative-Reports-Progress-Accelerating-Electronic-Transaction (last accessed Sept. 19, 2018).

[13] *Agency/Advertiser Membership*, TVB.org, available at https://www.tvb.org/AboutTVB/AgencyAdvertiserMembership.aspx (last accessed Sept. 19, 2018).

TV broadcasters and their media agency partners." [14]  Defendant Nexstar's President and CEO made a public statement about TIP indicating that the industry "must work together as an industry."[15]  The President and CEO of Defendant Sinclair echoed this sentiment stating that "[t]he TIP Initiative demonstrates the industry's shared commitment to working together" to grow their advertising sales.[16]  Defendant Tribune's President and CEO also indicated that through the TIP Initiative, Defendants could "actively work[] together."[17]

c.  All six Defendants are also members of the National Association of Broadcasters ("NAB"): Tegna's President and CEO, David Lougee, and Hearst's President, Jordan Wertlieb, both serve on NAB's Executive Committee.  Gray TV's Chairman, President, and CEO, Hilton Howell; Nexstar's Chairman, President and CEO, Perry Sook; Sinclair's President and CEO, Chris Ripley; and Tribune's COO, Kathy Clements, are members of NAB's Television Board of Directors.  The NAB describes itself as "the voice for the nation's radio and television broadcasters" and that "[a]s the premier trade association for broadcasters, NAB advances the interests of

---

[14] *Local Television Broadcasters' TIP (TV Interface Practices) Initiative to Accelerate Electronic Workflow for TV Advertising Transactions*, TVB.org, Nov. 20, 2017, available at https://www.tvb.org/DetailsPage/tabid/1569/ArticleID/3493/Local-Television-Broadcasters%E2%80%99-TIP-TV-Interface-Practices-Initiative-to-Accelerate-Electronic-Workflow-for-TV-Advertising-Transactions.aspx (last accessed Sept. 19, 2018).

[15] *Id.*

[16] *Id.*

[17] *Id.*

our members in federal government, industry and public affairs; [and] improves the quality and profitability of broadcasting[.]"[18]

56.     Additional circumstantial evidence further supports a plausible horizontal agreement by Defendants to increase the prices for local television advertisements.  These plus factors include: (1) a common motive to conspire; (2) actions against their apparent economic self-interest; and (3) inter-firm communications or other opportunities to conspire.

57.     <u>Common Motive</u>:  Defendants had a common motive to conspire.  Each Defendant faced declining demand for local television advertising.  To fill their capacity, Defendants would have to cut prices.  But by working together, Defendants could stabilize or even increase prices for local television advertising.

58.     <u>Actions Against Unilateral Economic Interest</u>: Defendants took actions against their economic self-interest.   According to the media reports about the DOJ investigation, Defendants' sales teams shared competitively sensitive information with each other.  Absent an agreement, competitors would not share such information, because its competitors would use that information to compete against it.   With a collusive agreement in place, however, sharing competitively sensitive information, such as CPP and GRP, or price grids, facilitates price-fixing.

59.     <u>Interfirm Communications and Other Opportunities to Collude</u>: Defendants had multiple opportunities to conspire at various industry organization and advocacy group meetings, and ample opportunity to trade proprietary advertising sales data at a variety of trade organizations, including TVB and NAB.  These and other trade organizations gave Defendants

---

[18] *National Association of Broadcasters 2015 Annual Report*, at 2, available at https://www.nab.org/documents/about/2015_NAB_Annual_Report.pdf (last accessed Sept. 19, 2018.)

ample opportunities for interfirm communications and their purpose was, in part, to share information or to increase profitability.

## FRAUDULENT CONCEALMENT AND TOLLING

60. Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the conspiracy. Defendants' conspiracy was secret and self-concealing. Defendants' actively and affirmatively concealed facts by which their collusion could be detected. Through no fault or lack of diligence, Plaintiff and members of the Class were deceived and did not know of and could not, in exercising reasonable diligence, learn about Defendants' collusion. Plaintiff and the Class reasonably relied on Defendants' concealment, the presumption of legality, the appearance of regular market activity and a competitive, efficient market. Defendants' conduct was only discovered through the DOJ's review of internal documents as part of the Sinclair-Tribune merger review process. For these reasons, all applicable statutes of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## ANTITRUST INJURY

61. Defendants' antitrust conspiracy had these effects, among others:

    a.    Price competition has been restrained or eliminated for local television advertising;

    b.    The prices of local television advertising have been fixed, raised, maintained, or stabilized at artificial levels;

    c.    Purchasers of local television advertising time have been deprived of the benefits of free and open competition;

     d.     Purchasers of local television advertising time paid artificially inflated prices; and

     e.     Absent Defendants' conspiracy, prices of local television advertising would have been determined by a competitive, efficient market.

62.     The purpose of the conspiracy was to fix, raise, stabilize and/or maintain the price of local television advertising time causing injury of the type that the antitrust laws were meant to deter.

63.     The precise overcharge affecting the prices of local television advertising time paid by Plaintiff and the Class can be measured and quantified using well- accepted models.

64.     Plaintiff and the members of the Class have sustained injury to their businesses or property, by paying higher prices for local television advertising time than they would have paid absent Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined.

## CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
### (Conspiracy in Restraint of Trade)

65.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

66.     From at least January 1, 2014 through the present, and until the effect of their unlawful conduct ceases, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy regarding local television advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

67.     The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels

the prices they charged for local television advertising time in the U.S.

68.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things they combined and conspired to do, including:

        a.      participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of local television advertisements in the U.S.; and

        b.      participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

69.     Defendants and their co-conspirators engaged in the actions described above to carry out their unlawful agreements to fix, maintain, raise, or stabilize prices of local television advertising time.

70.     Defendants' conspiracy had these effects, among others:

        a.      Price competition in the market for local television advertisements has been restrained, suppressed, and/or eliminated;

        b.      Prices for local television advertisement time provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the U.S.; and

        c.      Plaintiff and members of the Class who purchased local television advertisement time from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

71.     Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for local television advertising time

purchased from Defendants and their co-conspirators than they would have paid and will pay absent the conspiracy.

72.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

73.     Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged.

## <u>PRAYER</u>

**WHEREFORE**, Plaintiff and the Class respectfully request this relief:

A.     That the Court determine this action may be maintained as a class action under Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to every member of the Class;

B.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein, or from entering into any other contract, conspiracy, or combination having  a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     That Judgment be entered against Defendants, jointly and severally, and for

Plaintiff and members of the Class for treble the damages sustained by Plaintiff and the Class as allowed by law, with costs, including reasonable attorneys' fees and expenses, pre- and post-judgment interest at the highest legal rate after service of this Complaint to the extent provided by law;

E.    That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein;

F.    That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  September 24, 2018                       Respectfully submitted,

/s/ Steven A. Kanner
Steven A. Kanner
Michael J. Freed
Robert J. Wozniak
FREED KANNER LONDON &
MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500
skanner@fklmlaw.com
mfreed@fklmlaw.com
rwozniak@fklmlaw.com

26

Daniel J. Mogin
Jennifer M. Oliver
MOGINRUBIN LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
(619) 687-6611
dmogin@moginrubin.com
joliver@moginrubin.com

*Attorneys for Plaintiff*